No. 16-16665

_____

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

_____

VICTOR P. GIOTTA and LORALEE GIOTTA, On Behalf Of Themselves And
All Others Similarly Situated,

Plaintiffs and Appellants,

vs.

OCWEN FINANCIAL CORPORATION, *et al.*

Defendant and Appellee.

_____

**APPELLEE'S ANSWERING BRIEF**

_____

After an Order of the United States District Court, Northern District of California,
Case No. 5:15-cv-00620-BLF
Hon. Beth Labson Freeman

_____

Thomas J. Cunningham
525 Okeechobee Blvd
West Palm Beach, FL 33409
Phone: 561-833-7700
LOCKE LORD LLP

P. Russell Perdew
111 South Wacker Dr
Chicago, IL 60606
Phone:  312-443-0700
LOCKE LORD LLP

James C. Magid
44 Montgomery Street
San Francisco, CA 94104
Phone: 415-318-8810
LOCKE LORD LLP

*Attorneys for Defendant and Appellee*
*OCWEN LOAN SERVICING, LLC*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellee makes the following disclosure statement.

Ocwen Loan Servicing, LLC, is a wholly-owned subsidiary of Ocwen Mortgage Servicing, Inc. Ocwen Mortgage Servicing, Inc. is a wholly owned subsidiary of Ocwen Financial Corporation, a publicly traded corporation, with no entity owning more than 10% of its stock.

Dated:  June 29, 2017

Respectfully submitted,

_____ */s/ P. Russell Perdew* _____
P. Russell Perdew

Thomas J. Cunningham
James C. Magid

*Attorneys for Defendant and Appellee*
*Ocwen Loan Servicing, LLC*

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ........................................................................1

STATEMENT OF ISSUES ..................................................................................1

STATEMENT OF CASE .....................................................................................2

    **A.**  Ocwen imposed the fees at issue after the Giottas defaulted. .........................3

    **B.**  The Giottas do not dispute that the fees were legally authorized...................3

    **C.**  The Giottas argue Ocwen was required to itemize costs and profits of a third-party vendor. ..................................................................................5

    **D.**  The CFPB consent order explicitly contemplates the use of affiliated vendors who make a profit on default-servicing fees...................................5

    **E.**  The district court dismissed the SAC for multiple reasons. ..........................6

    **F.**  The Giottas have abandoned many claims on appeal...................................7

SUMMARY OF ARGUMENT ...............................................................................8

ARGUMENT ..................................................................................................11

I.    OCWEN MADE NO FALSE, DECEPTIVE, OR MISLEADING STATEMENTS. ...........................................................................................11

    **A.**  The district court did not misread the FDCPA............................................11

    **B.**  Ocwen accurately described the contractually authorized fees....................13

    **C.**  Ocwen never stated that its vendor did not earn a profit.............................14

    **D.**  Ocwen had no duty to breakdown the costs and profits of the third-party vendor that provided the service. ........................................................15

        **1.**  Numerous courts have rejected a duty to disclose profits....................16

        **2.**  The Giottas' cases do not impose a duty on Ocwen to disclose its vendor's profits. ..............................................................................18

        **3.**  Ocwen had no duty to disclose its vendor's profits because that information was not material.................................................................22

        **4.**  Altisource's alleged affiliation with Ocwen does not require Ocwen to disclose Altisource's costs and profits.................................25

II.    THE GIOTTAS' CLAIMS ARE BARRED BY THEIR FAILURE TO COMPLY WITH THE CONTRACTUAL NOTICE PROVISION...............28

   **A.** The notice provision applies to the claims here because the claims arise from Ocwen's performance of contractual duties..................................29

      **1.** Courts look at the relevant conduct, not a plaintiff's choice of legal theory, in deciding if contractual limitations apply.....................29

      **2.** The Giottas' cited cases are distinguishable because they involve conduct that is not addressed by the contract. ......................................34

      **3.** The Giottas raise new arguments on appeal that were waived and that should be rejected in any event................................................36

   **B.** The notice provision applies to claims against Ocwen. .................................40

      **1.** The deed of trust says that its provisions benefit servicers. .................40

         **a.** Ocwen is an assign. ....................................................................40

         **b.** Section 13's reference to Section 20 is irrelevant to the notice provision.......................................................................................42

      **2.** The parties understood that "Lender" referred to the servicer.............44

         **a.** The loan modification defines "Lender" to include both the noteholder and the loan servicer. ................................................44

         **b.** Nothing about the deed of trust precludes applying the loan modification's definition of "Lender."........................................45

      **3.** Even without the loan modification, the most reasonable interpretation of the deed of trust is to read "Lender" as including the servicer..........................................................................48

CONCLUSION ...............................................................................................................52

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allen v. JPMorgan Chase*,
  2016 WL 1029334 (S.D. Miss. Mar. 14, 2016)....................................43

*Baccei v. United States*,
  632 F.3d 1140 (9th Cir. 2011) ...............................................37

*Bahamas Sales Associate, LLC v. Byers*,
  701 F.3d 1335 (11th Cir. 2012) ............................................30, 31, 33

*Belcher v. Ocwen Loan Servicing*,
  2016 WL 7243100 (M.D. Fla. Dec. 15, 2016) ...........................36, 37

*Beyer v. Countrywide Home Loans*,
  2008 WL 1791506 (W.D. Wash. Apr. 18, 2008) ..............................35

*Bickel v. City of Piedmont*,
  16 Cal. 4th 1040 (1997) .....................................................37

*Bonilla v. Volvo Car Corp.*,
  150 F.3d 62 (1st Cir. 1998)..................................................17

*Bradley v. Franklin Collection Svcs.*,
  2011 WL 13134961 (N.D. Ala. Mar. 24, 2011) ..............................20

*California Ins. Guarantee Assn. v. Workers' Comp. Appeals Bd.*,
  203 Cal. App. 4th 1328 (2012) .............................................41

*Charles v. Deutsche Bank Nat'l Trust Co.*,
  2016 WL 950968 (S.D. Fla. Mar. 14, 2016) ..................................51

*Cirino v. Bank of Am., N.A.*,
  2014 WL 9894432 (C.D. Cal. Oct. 1, 2014)..............................32, 38

*Colon v. Nationstar Mortg.*,
  2015 WL 7422598 (S.D. Fla. Nov. 17, 2015) ................................35

*Derr v. Kimball, Tirey & St. John LLP*,
2012 WL 12874923 (S.D. Cal. Aug. 14, 2012)...................................................38

*Donohue v. Quick Collect, Inc.*,
592 F.3d 1027 (9th Cir. 2010) ..............................................19, 22, 23

*Dowdy v. Solutia Healthcare*,
2006 WL 3545047 (M.D. Tenn. Dec. 8, 2006) .................................................20

*Duraney v. Washington Mut. Bank*,
2008 WL 4204821 (W.D. Penn. Sept. 11, 2008)..............................................21

*Eger v. Messerli & Kramer*,
2015 WL 3915776 (D. Minn. June 25, 2015) ..................................................19

*Eller v. EquiTrust Life Ins. Co.*,
778 F.3d 1089 (9th Cir. 2015) ............................................................16

*Ferraro v. Wells Fargo N.A.*,
2013 WL 5357109 (M.D. Fla. Sept. 24, 2013).................................................51

*Fields v. Wilber Law Firm, P.C.*,
383 F.3d 562 (7th Cir. 2004) .............................................................19

*Fontaine v. Bank of Am., N.A.*,
2015 WL 128067 (S.D. Cal. Jan. 7, 2015) ....................................................26

*Gerber v. First Horizon*,
2006 WL 581082 (W.D. Wash. Mar. 8, 2006).............................................8, 36

*Gomez v. Niemann & Heyer*,
2016 WL 3562148 (W.D. Tex. June 24, 2016) .................................................19

*Goodrow v. Friedman & MacFadyen, P.A.*,
788 F. Supp. 2d 464 (E.D. Va. 2011) .....................................................38

*Graham v. Ocwen Loan Servicing*,
2016 WL 1573177 (S.D. Fla. Apr. 19, 2016)...................................................34

*Gustafson v. BAC Home Loans Servicing*,
294 F.R.D. 529 (C.D. Cal. 2013)........................................................33, 38

*Hill v. Nationstar Mortgage*,
　2015 WL 4478061 (S.D. Fla. Jul. 6, 2015) ................................................31, 38

*Hochberg v. Lenox, Socey, et. al*,
　2017 WL 1102637 (D. N.J. Mar. 24, 2017) .......................................................38

*Johnson v. Countrywide Home Loans, Inc.*,
　2010 WL 5138392 (E.D. Va. Dec. 10, 2010)................................................32, 38

*U.S. ex rel. Kelly v. Boeing Co.*,
　9 F.3d 743 (9th Cir. 1993) ...............................................................................41

*Kim v. Shellpoint Partners*,
　2016 WL 1241541 (S.D. Cal. Mar. 30, 2016) ...................................................35

*Langford v. Rite Aid of Alabama*,
　231 F.3d 1308 (11th Cir. 2000) .........................................................................16

*Lawrence v. Wells Fargo Bank, N.A.*,
　2014 WL 2705425 (N.D. Cal. June 13, 2014)...................................................26

*Levinson v. Green Tree Servicing*,
　2015 WL 1912276 (M.D. Fla. Apr. 27, 2015)............................................32, 38

*McCann v. Lucky Money, Inc.*,
　129 Cal. App. 4th 1382 (2005) ..........................................................................16

*Niyaz v. Bank of Am.*,
　2011 WL 63655 (E.D. Va. Jan. 3, 2011) ....................................................32, 38

*Paschette v. Wells Fargo Bank, N.A.*,
　2011 WL 2470314 (M.D. Fla. June 21, 2011) ..................................................51

*Patrick v. Teays Valley Trustee*,
　2012 WL 5993163 (N.D. W.Va. Nov. 30, 2012) ..............................................36

*Piper v. Portnoff Law Assocs., Ltd.*,
　396 F.3d 227 (3d Cir. 2005) ..............................................................................38

*Romea v. Heiberger*,
　163 F.3d 111 (2d Cir. 1998) ..............................................................................38

*Sandoval v. Wolfe*,
  2017 WL 244111 (S.D. Fla. Jan. 19, 2017)................................................31, 37

*Schwartz v. Comenity Cap. Bank*,
  2015 WL 410321 (S.D.N.Y. Feb. 2, 2015) ........................................................35

*Sigwart v. U.S. Bank N.A.*,
  2014 WL 1322813 (D. Haw. Mar. 31, 2014) ....................................................35

*Singer v. Pierce & Assoc.*,
  383 F.3d 596 (7th Cir. 2004) .............................................................................21

*Spiegler v. Home Depot USA, Inc.*,
  349 F. Appx. 174 (9th Cir. 2009) ...............................................................17, 18

*St. Breux v. U.S. Bank, N.A.*,
  919 F. Supp. 2d 1371 (S.D. Fla. 2013).......................................................30, 35

*Taub v. World Financial Bank*,
  950 F. Supp. 2d 698 (S.D.N.Y. 2013) ..............................................................35

*Tourgeman v. Collins Fin. Svcs.*,
  755 F.3d 1109 (9th Cir. 2014) ..........................................................................18

*Trevathan v. Select Portfolio Servicing, Inc.*,
  142 F. Supp. 3d 1283 (S.D. Fla. 2015)..............................................................51

*United States v. FMC Corp.*,
  531 F.3d 813 (9th Cir. 2008) .............................................................................26

*Wilson v. Trott Law*,
  118 F. Supp. 3d 953 (E.D. Mich. 2015) ............................................................20

*Wolhuter v. Carrington Mortg. Servs., LLC*,
  2015 WL 12819153 (M.D. Fla. Oct. 28, 2015)..................................................42

## Statutes and Rules

*Federal Authorities*

12 U.S.C. § 1701j-3 ................................................................................................37

12 U.S.C. § 2605(g) ................................................................................................48

12 U.S.C. § 2616 .........................................................................................................37

15 U.S.C. § 1610(a)(1) ...............................................................................................37

15 U.S.C. § 1681t .......................................................................................................37

15 U.S.C. § 1692e ..............................................................................5, 14, 21, 22, 24

15 U.S.C. § 1692l .......................................................................................................38

15 U.S.C. § 1692n ......................................................................................................37

12 C.F.R. § 1024.34 ...................................................................................................48

Fed. R. App. P. 28(a)(4) ..............................................................................................1

*State Authorities*

Cal.Civ.Code § 1788.33 .............................................................................................37

## JURISDICTIONAL STATEMENT

Ocwen agrees with the information in the Giottas' jurisdictional statement regarding the jurisdictional issues listed in FRAP 28(a)(4) and Circuit Rule 28-2.2, and Ocwen agrees that the district court and this Court have subject-matter jurisdiction. Ocwen does not here comment on other extraneous information included in the Giottas' jurisdictional statement.

## STATEMENT OF ISSUES

1.     After the Giottas defaulted on their loan, Ocwen charged them fees for services provided through a third-party vendor. The Giottas do not dispute that the services were provided or that the fees were authorized by the loan contract; they do not challenge the amount of the fees; and, they do not claim Ocwen marked up or otherwise made a profit on the fees. Were the statements identifying the fees nonetheless false, deceptive, or misleading because the statements did not separately itemize the costs and profits of Ocwen's third-party vendor?

2.     The Giottas' loan contract requires them to provide notice and an opportunity to take corrective action before filing a lawsuit arising out of actions taken under the contract. This case challenges how Ocwen imposed contractually authorized fees. Can the Giottas avoid compliance with the contractual notice provision because the Giottas chose to assert statutory claims rather than a contract claim?

3.     Can the Giottas avoid compliance with the contractual notice provision because the fees were imposed by loan-servicer Ocwen rather than by the current noteholder of their loan?

## STATEMENT OF CASE

The Giottas undisputedly defaulted on their home loan, so their loan servicer (Ocwen) hired a third-party vendor (Altisource) to arrange for property valuations and periodic property inspections to ensure the property was being maintained. Ocwen billed the Giottas for these property-inspection and property-valuation[1] fees that were prompted by the default.

The Giottas acknowledge their loan contract explicitly authorized Ocwen to charge them for these services. They don't deny the services were performed. And the Giottas do not claim on appeal that the amount or frequency of the charges was uncommon, unreasonable, or otherwise unlawful. Instead, their sole complaint is that Ocwen allegedly deceived them by sending statements listing the charges without separately itemizing Altisource's (*i.e.,* the vendor's) profits (which the Giottas repeatedly call an "add-on fee"). To emphasize: the Giottas do not claim that Ocwen was required to itemize ***its own*** costs and profits—they acknowledge Ocwen made no profit on these fees—but instead claim Ocwen was required to itemize its ***third-party vendor*** Altisource's costs and profits.

---

[1] A property valuation is sometimes called a BPO, which stands for broker's price opinion.

The district court dismissed the first amended and second amended complaints, finding no basis for the Giottas' claims regarding contractually-authorized charges. This Court should affirm.

## A.    Ocwen imposed the fees at issue after the Giottas defaulted.

This case arises out of a loan the Giottas received in 2007 that was secured by their home. ER 102, ¶ 16. The Giottas admittedly defaulted on that loan by missing payments before Ocwen became the loan servicer in February 2013. ER 102–03, ¶ 16.

After the Giottas defaulted, Ocwen charged the Giottas for two property valuations—one in September 2013 and a second in December 2014—and a total of eleven property inspections in the seventeen months between August 2013 and February 2015. ER 519–525.[2] Ocwen charged the Giottas $100 for each of the two property valuations and between $10.50 and $15 for the property inspections. *Id.*

## B.    The Giottas do not dispute that the fees were legally authorized.

The Giottas cannot dispute that, once they defaulted, their loan contract explicitly authorized property inspections and property valuations. ER 268, § 14

---

[2] This exhibit, which was attached to the Giottas' SAC, also reflects dates (*e.g.*, 6/27/14) on which Ocwen received the Giottas' payments and applied the payments to these fees. Payment application is reflected in the "PaymentReceivedDate" column of the exhibit, and assessment of the fee is reflected in the "DateAssessedOrTransactionDate" column of the exhibit. ER 519–525. The Giottas' statement of the case recites a third set of dates, *i.e.*, the dates on which mortgage statements reflecting these charges were sent to the Giottas. Br., p. 6.

("Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to … property inspection and valuation fees."); *see also* ER 266, § 9.

Further, the Giottas' opening brief on appeal does not claim that the inspections and valuations were conducted too frequently, that the fees were unreasonably high or were in excess of any accepted market rate for such fees, or that the fees were otherwise unlawful. The Giottas also admit that fees were for services that were actually performed. Br., p. 5 ("Ocwen procured these services on the lender's behalf, then charged the Giottas fees for these services and included such charges in the Giottas' monthly mortgage statements.").

The Giottas also acknowledge that, as their loan servicer, Ocwen was authorized to arrange for property inspections and valuations and to charge borrowers for those services. ER 114, ¶ 31; Br., p. 5 ("Because the Giottas were in default on their mortgage, Ocwen had the added role of performing and charging the Giottas for certain services to protect the lender's interest in the Giottas' loan."). Indeed, in the district court, the Giottas specifically disclaimed any allegations that the fees at issue violated their contract. ER 157, ¶ 162.

Finally, the Giottas explicitly disclaim any allegation that the fees were not legally authorized. Br., p. 18 ("Whether the fees are legally authorized is not an

element of … Plaintiffs' claims under 15 U.S.C. § 1692e."); *Id.*, p. 22 (disclaiming any allegation that fees were "not legally authorized.").

### C. The Giottas argue Ocwen was required to itemize costs and profits of a third-party vendor.

Rather than attack Ocwen's imposition of the fees, the Giottas claim that Ocwen deceived or misled them about the fees on monthly statements. Notably, the Giottas do not claim that the statements inaccurately described the valuations or inspections for which the fees were imposed or that Ocwen otherwise made any other false statements. Nor do they claim that the charge included an undisclosed element of profit for Ocwen. Rather, Giottas complain that the statements don't disclose: (1) that Ocwen used a third-party vendor (Altisource, alleged to be an Ocwen affiliate) to arrange for the services; and, (2) the vendor's cost and profit in providing the services. Br., pp. 7–8.

### D. The CFPB consent order explicitly contemplates the use of affiliated vendors who make a profit on default-servicing fees.

The Giottas reference a consent order between Ocwen and the Consumer Financial Protection Bureau (CFPB) regarding servicing practices. Br., p. 13. As discussed below, the Giottas have no standing to enforce that order. But even if they did, the Giottas alleged no facts showing a violation of the order, which: (1) permits servicers to use affiliated third-party vendors in the performance of default-related services; (2) permits affiliated vendors to make a profit on those

services so long as the resulting charge is a reasonable market rate; and, (3) does *not* require the servicer to disclose the use of a vendor or the vendor's cost and profit structure. ER 440–441, ¶ VI.C.

     **E.    The district court dismissed the SAC for multiple reasons.**

The district court dismissed the SAC for two primary reasons. First, the court relied on a provision of the Giottas' loan contract requiring them to provide the "Lender" notice of any inappropriate conduct and an opportunity to take corrective action before filing suit. *See* ER 269, § 20 ("Neither Borrower nor Lender may commence … any judicial action … that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party … of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.").

The district court dismissed the SAC because the Giottas' undisputedly failed to provide such notice to Ocwen or to anyone else. In so doing, the court rejected the Giottas' attempts to avoid compliance with the notice provision. Specifically, the court found the notice provision applied to all of the Giottas' claims, including statutory claims, because the claims all arose from fees that Ocwen imposed under authority granted by the loan contract. ER 7–10. The court

also found that Ocwen—the loan servicer that received and applied payments on the noteholder's behalf, including the fees at issue—could invoke the notice provision in the loan contract. ER 6–7.

Separate and apart from the notice provision, the district court also held that the FDCPA and RFDCPA claims were baseless. The court found no legal basis for the Giottas' theory that Ocwen was required to disclose the cost and profit structure of its third-party vendor. ER 15 ("Plaintiffs offer no authority for the proposition that Ocwen Servicing's disclosure of the amount of the BPO fee that it paid Altisource and recouped from Plaintiffs was inadequate because Ocwen Servicing did not also obtain and disclose Altisource's breakdown of its cost and profit.").

### F. The Giottas have abandoned many claims on appeal.

The district court dismissed all seven claims in the SAC, but the Giottas' opening brief only appeals that dismissal as to three claims: alleged violations of the FDCPA, RFDCPA, and a derivative claim under the "unlawful" prong of California's Unfair Competition Law. Br., p. 1. The RFDCPA and UCL claims are admittedly wholly derivative of the FDCPA claim. Br., pp. 37–38. Thus, the sole issue on appeal is whether the Giottas have pled an FDCPA violation.

## SUMMARY OF ARGUMENT

The district court's dismissal can be affirmed for either of two independent reasons. ***First***, the Giottas cannot state an FDCPA claim because Ocwen's monthly statements were not false, deceptive, or misleading. The Giottas do not challenge the property-inspection and valuation fees themselves, which were admittedly authorized by their contract and which are not alleged to be unreasonably high, frequent, or otherwise without legal authorization. Nor do they claim that the monthly statements did not accurately describe the type of fees or the amount charged to Ocwen, which were individually itemized in the statements. Rather, their claim is based on their belief that Ocwen was required to provide an additional sub-itemization of the vendor's cost and profit structure for each fee.

In basing their claim on an alleged failure to disclose, the Giottas ask this Court to create a disclosure duty that no statute, regulation, or other court has ever imposed. As the district court noted, there is no authority for requiring Ocwen to learn and disclose the cost and profit structure of its vendor. In fact, courts have overwhelmingly rejected an even narrower duty for companies to disclose their own profits; no court has ever gone even farther to require a company to learn and disclose its vendor's costs and profits.

The Giottas attempt to justify their disclosure duty by claiming they could have challenged the fees as violating their contract had they known of Ocwen's

vendor's profits. But the Giottas had all the information they needed to challenge the type, amount, or frequency of the fees. Knowing the cost and profit structure of Ocwen's vendor would not have provided a basis for challenge because neither the contract, nor anything else, prohibits Ocwen from using an affiliated and for-profit vendor for property inspections and valuations. In fact, at least one California court has explicitly approved that arrangement. And while the Giottas purport to rely on a CFPB consent order (that they have no standing to enforce), that order explicitly contemplates that a loan servicer can use an affiliated and for-profit vendor for default services as long as the overall amount of fee remains appropriate. Thus, the Giottas provide no authority for a duty to disclose vendor profits, and this Court should affirm the district court's dismissal for this reason alone.

**Second**, the district court's decision can also be affirmed because the Giottas failed to comply with a contractual provision requiring them to give Ocwen notice and an opportunity to take corrective action before filing suit. The Giottas do not claim to have complied with the notice provision, but instead offer two unpersuasive reasons for their failure to comply.

The Giottas first argue the notice provision does not apply because they assert only statutory claims and no breach-of-contract claim. But that argument is contradicted by the language of the provision, which applies to ***any*** claim arising from the contract and not just breach-of-contract claims. Beyond the plain

language, numerous cases have rejected their argument by applying the same notice provision (or other contractual provisions) to FDCPA and other statutory claims. Those cases (and most of the cases cited by the Giottas) recognize that the correct test is whether the ***conduct*** at issue was performed under the contract rather than which legal theory the plaintiffs choose to rely upon.

The Giottas also argue that loan servicers like Ocwen cannot rely on the notice provision because the provision uses the term "Lender," which the Giottas believe is limited to the noteholder. This argument fails for several reasons. Most significantly, it ignores a separate provision that extends the Lender's rights under the deed of trust to the Lender's "assigns," which includes Ocwen because Ocwen was assigned the loan's servicing rights. Further, the Giottas signed a loan modification that explicitly defined "Lender" to include the loan servicer and that controls the deed of trust. Finally, the deed of trust repeatedly authorizes only the "Lender" to perform tasks that loan servicers typically perform (including imposing the fees at issue here), which further demonstrates that "Lender" is intended to include loan servicers who act on the noteholder's behalf.

Thus, this Court should affirm the district court's dismissal both because the Giottas cannot state an FDCPA claim and because they failed to comply with the applicable notice provision.

**ARGUMENT**

## I.   OCWEN MADE NO FALSE, DECEPTIVE, OR MISLEADING STATEMENTS.

The Giottas' case rests on an unprecedented proposition that has no basis in the FDCPA or in any other statute or authority. They claim Ocwen's accurate description of services and the amount Ocwen paid for those services (and sought to pass through to the Giottas) was misleading because Ocwen did not determine and disclose the cost and profit structure of Ocwen's third-party vendor. But no statute, regulation, court opinion, or other authority has ever imposed a duty to make that disclosure; the Giottas want this Court to simply create such a duty. In fact, courts have overwhelmingly rejected the narrower duty for a company to disclose its own cost and profit structure. The district court thus correctly found that there was no legal basis for creating and imposing such a disclosure duty here. This Court should affirm the district court's dismissal and decline the Giottas' request to invent a never-before-seen disclosure duty.

### A.   The district court did not misread the FDCPA.

Preliminarily, the Giottas' incorrectly say (many times) that the district court misunderstood their claim that Ocwen made misleading statements by requiring "allegations that the fees were not legally authorized." Br., p. 33; *see also Id.*, pp. 19, 20, 21, 22, 33–37. On the contrary, the district court squarely addressed and rejected the Giottas' claim that Ocwen had a duty to disclose its vendor's profits.

11

ER, p. 15 ("Plaintiffs offer no authority for the proposition that Ocwen Servicing's disclosure of the amount of the BPO fee that it paid Altisource and recouped from Plaintiffs was inadequate because Ocwen Servicing did not also obtain and disclose Altisource's breakdown of its cost and profit."). Thus, the court's analysis correctly evaluated the propriety of Ocwen's disclosure rather than authorization for the underlying fees.

The district court did discuss whether the fees were legally authorized but only while separately rejecting *other* theories of liability that the Giottas asserted below but have since abandoned on appeal. Specifically, the court rejected their argument that a servicing-transfer letter contained language prohibiting Ocwen from charging for property inspections. ER 14–15. The court also rejected the argument that Ocwen could not charge for both property inspections and property valuations because doing so was supposedly illegal "double dipping." ER 15. The court rejected both arguments because the fees at issue were legally authorized, and the Giottas have not appealed that decision. The district court's analysis of those other, abandoned theories has nothing to do with the district court's proper rejection of the Giottas' sole remaining theory that Ocwen made misleading statements by not disclosing its vendor's costs and profits.

**B.    Ocwen accurately described the contractually authorized fees.**

The Giottas claim Ocwen's monthly statements violate § 1692e(2) of the FDCPA, which prohibits a "false representation of—(A) the character, amount, or legal status of any debt; or (B) any services rendered or compensation which may be lawfully received by any debt collector …." Br., p. 23; 15 U.S.C. § 1692e(2). But Ocwen's monthly statements correctly describe the fees at issue.

The monthly statements made no false statements about the "character" or "amount" of the fees, or about the "services rendered" in connection with the fees. The statements correctly describe the service for which the fee was charged (either "Property Inspection Fee" or "Property Valuation Expense") and the fee amount charged to Ocwen and passed on to the Giottas (between $10.50 and $15 for property inspections and $100 for property valuations). ER 508–515. The Giottas never allege that the fees were for services other than property inspections and property valuations, and they never allege that Ocwen did not pay its vendor the same amounts listed in the statements for those services.

Nor do the statements make any false statement regarding the "legal status" of the fees or the "compensation which may be lawfully received" for the fees. The monthly statements listed the fees as amounts the Giottas owed; this was accurate because the loan contract authorized Ocwen to charge fees for inspections and valuations. ER 268, ¶ 14 ("Lender may charge Borrower fees for services

13

performed in connection with Borrower's default … including … property inspection and valuation fees."). Further, the controlling contract does not prohibit Ocwen from using an allegedly affiliated and/or for-profit vendor to provide services for a defaulted loan.

In fact, the Giottas' opening brief never claims that the fees weren't legally authorized; it instead repeatedly states that such a showing is unnecessary. Br., p. 18 ("Whether the fees are legally authorized is not an element of—and not the correct standard for—Plaintiffs' claims under 15 U.S.C. § 1692e(2)."); *Id.*, p. 22 (stating the Giottas' § 1692e does not require showing that fees were "not legally authorized"). Thus, there is no dispute that the fees were legally authorized, so Ocwen's statements that the Giottas owed those fees were all accurate.

Because Ocwen's monthly statements correctly listed the character, amount, and legal status of the fees and the services that generated those fees, Ocwen made no false statements about the fees at issue.

### C. Ocwen never stated that its vendor did not earn a profit.

The Giottas suggest that Ocwen misled them into believing that no entity would earn a profit on the property inspections and valuations. Br., pp. 8–11. But Ocwen never said any such thing.

Ocwen correctly informed the Giottas that property inspections were performed after a default to ensure the property remains "occupied", "appropriately

maintained", and "in good condition", and that property valuations were performed by "brokers or other qualified individuals" or by a "certified Real Estate Agent" to determine the value of the property. ER 281, 516. The Giottas never allege that the inspections and valuations were not performed for these purposes, or that an appropriate individual did not perform the valuations.

Ocwen never said no one would earn a profit on the inspections or valuations. The mere fact that Ocwen identified the individuals who perform the inspections or valuations (*e.g.*, a real estate agent) does not mean that the fee only represents money paid to that individual person, as the Giottas suggest. Br., p. 9 (complaining that statements don't mention "any other entity being involved other than the broker or property inspector"). Most businesses earn profits, and many use third-party contractors rather than direct employees to perform services, so the Giottas can hardly claim to be misled by the failure to specifically itemize costs and profits. Indeed, as discussed in the next section, numerous courts have rejected any such duty to itemize profits.

### D. Ocwen had no duty to breakdown the costs and profits of the third-party vendor that provided the service.

Rather than identify false statements that Ocwen *did* make, the Giottas instead claim that what Ocwen *did not* say renders the monthly statements misleading. Specifically, the Giottas claim the statements are misleading because Ocwen did not itemize its vendor's costs and profits. The Giottas attempt to give

their claim rhetorical appeal by repeatedly calling the vendor's profit an "add-on fee" or an "add-on charge." Br., p. 25 (complaining about statements "hiding Altisource's add-on fees in the charges for the BPO or Property Inspection"). But the supposed "add-on fee" is simply profit earned by Ocwen's vendor.

Just as the district court noted, the Giottas "offer no authority for the proposition that Ocwen Servicing's disclosure of the amount of the BPO fee that it paid Altisource and recouped from Plaintiffs was inadequate because Ocwen Servicing did not also obtain and disclose Altisource's breakdown of its cost and profit." ER 15. Thus, this Court should affirm the district court's dismissal.

### 1. Numerous courts have rejected a duty to disclose profits.

The Giottas are not the first consumers to claim they are entitled to receive an itemized breakdown of how charges are structured. Multiple courts, including this one, have rejected that theory. *Eller v. EquiTrust Life Ins. Co.*, 778 F.3d 1089, 1092–93 (9th Cir. 2015) ("We begin from the settled premise that a seller generally has no duty to disclose internal pricing policies or its method for valuing what it sells."); *McCann v. Lucky Money, Inc.*, 129 Cal. App. 4th 1382, 1395 (2005) (affirming dismissal of claim that foreign-currency vendor failed to disclose portion of exchange rate that constituted vendor's profit; "Defendants are engaged in business for a profit. Their failure to disclose their own costs or profit margins is not, on its face, unfair."); *see also Langford v. Rite Aid of Alabama*, 231 F.3d 1308,

1313 (11th Cir. 2000) (affirming dismissal of mail and wire fraud claim based on pharmacy's failure to disclose upcharge imposed on uninsured customers; "As a general matter of federal law, retailers are under no obligation to disclose their pricing structure to consumers."); *Bonilla v. Volvo Car Corp.*, 150 F.3d 62, 70–71 (1st Cir. 1998) (reversing RICO judgment because auto-manufacturer defendant had no duty to disclose that $3,100 retail charge for accessory package cost manufacturer $155, a 95% profit margin, even though "plaintiffs testified that they would not have paid these surcharges had they known that the added accessories were so minor.").

Particularly applicable is *Spiegler v. Home Depot USA, Inc.*, where the plaintiff complained that the defendant (a retailer) quoted a cabinet-refinishing price that appeared to be based on a price-per-square-foot but that was actually based on fewer square feet and included an undisclosed administrative fee. 552 F. Supp. 2d 1036, 1040 (C.D. Cal. 2008). Like the Giottas here, the plaintiffs in *Spiegler* argued that the defendant should have disclosed this alleged overcharge because "defendants had exclusive knowledge of the overcharge and that facts about the overcharge were material because plaintiffs would not have paid defendants if they had been properly informed." *Id.* at 1047. But the trial court dismissed plaintiffs' claims of unfair and fraudulent business practices and breach of the implied covenant "[b]ecause plaintiffs have failed to identify any

17

misrepresentation or actionable omission …" and because plaintiffs could not identify any contractual provision that defendants violated by charging the agreed upon price. *Id.* at 1050–52. This Court affirmed. *Spiegler v. Home Depot USA, Inc.*, 349 F. Appx. 174 (9th Cir. 2009).

Thus, substantial authority rejects any duty to disclose a charge's cost and profit structure. And the Giottas' theory is even more attenuated than the theory rejected by the above courts. The Giottas don't claim Ocwen had to disclose its own profits (Ocwen made no profit on the charges at issue); the Giottas claim Ocwen had to learn and disclose the profits of Ocwen's vendor Altisource. No case or other authority supports such a duty, and this Court should decline the Giottas' invitation to create such a duty for the first time.

**2.     The Giottas' cases do not impose a duty on Ocwen to disclose its vendor's profits.**

The Giottas cite many FDCPA cases, but not a single one imposes a duty to learn and disclose a vendor's cost and profit structure. Indeed, one 9th Circuit case they cite, *Tourgeman v. Collins Fin. Svcs.*, 755 F.3d 1109 (9th Cir. 2014), did not even involve disclosure of charges. Instead, *Tourgeman* simply held that misidentifying the original creditor and account number in a collection letter was materially misleading because it could lead the consumer to "engage in a fruitless attempt to investigate the facts of this non-existent debt …." 755 F.3d at 1121. Nothing about that holding supports creating a new duty to disclose a vendor's

profits. The Giottas also cite *Donohue v. Quick Collect, Inc.*, 592 F.3d 1027 (9th Cir. 2010), but that case doesn't help them either. *Donohue* found no misleading statements and no FDCPA violation where a debt-collection letter misidentified a charge as "interest of 12%" when the charge actually included both a late fee and an interest charge. This Court held that while the letter was technically false, the misidentification of a late fee as interest was "not materially false", so no claim was stated. *Id.* at 1034.

The Giottas do cite cases finding fee disclosures to be misleading, and while some of the cases discuss itemization, none involved vendor profits. Almost all of the cases involve debt-collection letters that added collection costs (sometimes before the costs had even been approved in court) or other amounts to the underlying debt to create a single amount due without stating that the amount due included amounts beyond the underlying debt. *See Fields v. Wilber Law Firm, P.C.*, 383 F.3d 562, 565–66 (7th Cir. 2004) (debt-collection letter was misleading where the letter listed non-itemized "Account Balance" that included the original debt, interest, late fees, and $250 in attorneys' fees that were not set by contract and that had not been awarded by any court); *Gomez v. Niemann & Heyer*, 2016 WL 3562148, at *9 (W.D. Tex. June 24, 2016) (letter misleading where it stated a single amount due that included "a variety of unspecified fees, assessments, and attorneys' fees"); *Eger v. Messerli & Kramer*, 2015 WL 3915776, at *2-3 (D.

Minn. June 25, 2015) (letter misleading where it included $90 in garnishment fees in total amount due without itemizing and before fees had received required court approval); *Bradley v. Franklin Collection Svcs.*, 2011 WL 13134961, at *11 (N.D. Ala. Mar. 24, 2011) (letter misleading where single account balance included collection costs that had not been awarded); *Dowdy v. Solutia Healthcare*, 2006 WL 3545047, at *9 (M.D. Tenn. Dec. 8, 2006) (letter misleading where account balance included principle balance that had been doubled by creditor, without contractual authorization, to cover debt collector's 50% contingency fee). Another case listed amounts for property-inspection fees and attorneys' fees without properly identifying those fees. *Wilson v. Trott Law*, 118 F. Supp. 3d 953, 962-64 (E.D. Mich. 2015) (letter misleading because it combined property-inspection fees and attorneys' fees into single, undefined category listed as "corporate advances").

These cases all found that combining separate and independent categories of fees together into a single, undifferentiated balance was misleading because it prevents the consumer from evaluating the propriety of each individual category of fees. Thus, plaintiffs in those cases could not evaluate the amount of property-inspection fees, attorneys' fees, garnishment fees, or other collection costs. But here, the fees at issue were included in a separate line item explaining exactly what those fees were: property-inspection fees or property-valuation fees. The Giottas want this Court to go beyond the cases they cite and require a second level of

itemization where each individual line item is further broken down by vendor cost and vendor profit. No case has ever imposed such a duty.

Indeed, the Giottas cite *Duraney v. Washington Mut. Bank*, 2008 WL 4204821, at *17 (W.D. Penn. Sept. 11, 2008) as an example of an appropriate and non-misleading collection letter because the letter separately listed the attorneys' fees. Br., p. 31. But the opinion in *Duraney*, which dismissed an FDCPA claim, does not indicate that the loan servicer was required to not only itemize the attorneys' fees but further break out the costs and profits of the law firm that provided the services. That's because no such duty exists. Other courts have also approved letters seeking payment of charges incurred by a third-party vendor without any breakdown of the vendor's costs and profits. In *Singer v. Pierce & Assoc.*, 383 F.3d 596, 597 (7th Cir. 2004), the court affirmed the dismissal of an FDCPA claim based on a collection letter that itemized several third-party vendor costs, including attorneys' fees, marketing costs (for a foreclosure sale), and property inspections but that did not sub-itemize each vendor's costs and profits. *Id.* at 598 ("[defendant] segregated the attorneys' fees from the underlying debt in an itemized list of expenses, thus avoiding a § 1692e or § 1692f violation.").

The Giottas also cite *Daniel v. Select Portfolio Servicing, LLC*, which denied a motion to dismiss an FDCPA claim based on a collection letter claimed to be misleading in two respects: (1) the letter sought to collect a $15 property-

inspection fee where the loan-servicer defendant only paid $12 to a vendor for the property inspection and added a $3 markup; and, (2) the letter included an additional $1.50 charge for "MISC. CORPORATE DISBURSEMENT" that was undefined and allegedly for no service rendered. 159 F. Supp. 3d 1333, 1334 (S.D. Fla. 2016). But neither feature is present here. Ocwen added nothing to the amount charged by its vendor; it simply passed the charge on to the Giottas. And, Ocwen added no additional fee that was not tied to a specific and contractually authorized service. Nor is there any allegation here that Altisource performed no service. In fact, the Giottas specifically acknowledged that Altisource arranged for services to be performed and negotiated lower prices from service providers in exchange for higher volume. ER 122, ¶ 53. Thus, *Daniel* has no application, and certainly does not overcome the numerous cases listed above holding that companies generally have no duty to disclose the cost and profit that makes up a contractually authorized charge.

> ### 3.    Ocwen had no duty to disclose its vendor's profits because that information was not material.

As one of the Giottas' own Ninth Circuit cases recognize, any alleged false or misleading statement must be material to be actionable under the FDCPA. *Donohue*, 592 F.3d at 1033 ("a false or misleading statement is not actionable under § 1692e unless it is material."). For purposes of the FDCPA, a fee description is "materially" misleading only where it impacts the consumer's ability

to challenge the fee. *Donohue*, 592 F.3d at 1034 ("we are not concerned with mere technical falsehoods that mislead no one, but instead with genuinely misleading statements that may frustrate a consumer's ability to intelligently choose his or her response.").

Here, Ocwen's monthly statement itemized each fee individually, accurately informed the Giottas what service each separate fee was for, and correctly stated the amount that Ocwen paid and was passing along. This gave them the ability to challenge each fee for multiple reasons, including: (1) they were not in default; (2) property inspections or valuations were not authorized by the contract in the event of default; (3) the services were not actually provided; (4) the services were performed too frequently; or (5) the amount of the fee was in excess of a reasonable market rate or was otherwise unreasonably high. Of course, none of those bases for challenging the fees exist here, but the monthly statements described the fees with sufficient detail to enable the Giottas to question or challenge the fees if a legitimate basis for challenging the fees existed.

The Giottas nonetheless claim they needed even more information—a breakdown of Ocwen's vendor's costs and profits—to determine whether to challenge the fees. Br., p. 27. Specifically, they claim that had they known Ocwen's vendor made a profit, they could have claimed the fees violated the contract and thus the FDCPA. *Id.* But the fact that Ocwen's vendor earned a profit

on the fees would provide no basis to challenge them because nothing in the contract (or any law) prohibits such a profit. Rather, the contract explicitly authorizes fees for property inspections and valuations with no prohibition on vendor profit (or Ocwen profit, though Ocwen made no such profit here). ER 268, ¶ 14. Thus, a disclosure of Ocwen's vendor's profits would not have been material because it would not have permitted the Giottas to challenge the fees at issue.[3]

Indeed, the Giottas have repeatedly disclaimed any allegation that the fees at issue violate the contract. ER 157, ¶ 162; Br., p. 18 ("Whether the fees are legally authorized is not an element of … Plaintiffs' claims under 15 U.S.C. § 1692e."); *Id.*, p. 22 (disclaiming any allegation that fees were "not legally authorized."). The Giottas cannot both concede that the fees were contractually authorized but also claim they could have challenged the fees as violating the contract so as to support the required finding of materiality. Their concession that the fees are contractually authorized demonstrates that an additional disclosure of Ocwen's vendor's costs and profits would not have allowed them to challenge the fees and that such a disclosure was therefore immaterial. Thus, the failure to provide such information cannot violate the FDCPA.

---

[3] The Giottas also say that if the monthly statements had itemized Ocwen's vendor's costs and profits, they could have disputed the fees under the FDCPA or complained about the fees to the CFPB. Br., p. 27. But such a dispute or complaint would have been meaningless because, as discussed above, the fees were authorized by the contract.

**4.    Altisource's alleged affiliation with Ocwen does not require Ocwen to disclose Altisource's costs and profits.**

Rather than cite any cases or other authority imposing a duty to disclose a vendor's profit and cost structure, the Giottas instead suggest that this Court should invent such a duty because Ocwen and its vendor Altisource are allegedly affiliates. Br., p. 11–13. The Giottas even go so far as to suggest that Ocwen's use of an affiliate somehow violates a consent judgment between Ocwen and the CFPB. Br., p. 13. But the Giottas' attempt to create an exception to the overwhelming law holding that no duty exists to disclose cost and profit structure is inconsistent with both California law and the very CFPB consent order they attempt to rely upon. Thus, there remains no support for the disclosure duty the Giottas ask this Court to create.

A California appellate court previously considered the exact issue the Giottas complain about here, *i.e.*, whether a loan servicer can charge a defaulted borrower a fee for default services provided through an affiliated vendor where the vendor earns a profit. In *Walker v. Countrywide Home Loans*, the appellate court affirmed summary judgment on defaulted borrowers' claims that their loan servicer acted unfairly or deceptively in charging the borrowers fees for property inspections made by an affiliated vendor. 121 Cal. Rptr. 2d 79 (Cal. Ct. App. 2002). The court specifically noted that the loan-servicer defendant used an affiliated vendor to perform the inspections and that the vendor "makes about a $3

profit on each property inspection." *Id.* at 85. Thus, the holding in *Walker* contradicts the notion that there was anything inappropriate about Ocwen's alleged affiliate performing default services even where that affiliate (like any business) earns a profit on the services it performs.

Further, the Giottas incorrectly claim that Ocwen's use of an affiliated and for-profit vendor for default services violates a CFPB consent order. In reality, that consent order doesn't prohibit a loan servicer's use of affiliated, for-profit vendors for default services.[4] Rather, the order explicitly contemplates that servicers can use affiliated and for-profit vendors so long as the overall fee remains a reasonable market rate. Specifically, the order's section titled "Third-Party Fees" addresses both property-inspection and property-valuation fees. ER 440, ¶ VI.C.1.b and ¶ VI.C.1.c. The order explicitly permits a servicer to use an affiliate for property

---

[4] Further, the Giottas have no standing to enforce any requirement of the CFPB consent order (also known as the National Mortgage Settlement). *United States v. FMC Corp.,* 531 F.3d 813, 820–21 (9th Cir. 2008) ("[C]onsent decrees are construed as contracts for purposes of enforcement …. [W]hen the government is the plaintiff, third-party beneficiaries are presumed to be incidental in the absence of a clear expression of a different intent in the consent decree."); *Fontaine v. Bank of Am., N.A.,* 2015 WL 128067, at *8 (S.D. Cal. Jan. 7, 2015) (finding borrower lacked standing to enforce CFPB consent order; "The precise language of the Consent Judgment does not establish a clear intent to rebut the presumption that the third parties to the Consent Judgment are merely incidental beneficiaries."); *Lawrence v. Wells Fargo Bank, N.A.,* 2014 WL 2705425, at *6 (N.D. Cal. June 13, 2014) ("[t]he court agrees with Wells Fargo that plaintiff has no standing to enforce the National Mortgage Settlement consent judgment. Numerous courts have held that individual borrowers are merely incidental beneficiaries of the National Mortgage Settlement, and so have no right to bring third-party suits to enforce the consent judgment.")

inspections and valuations so long as the fee "does not exceed the lesser of (a) any fee limitation or allowable amount for the service under applicable state law, and (b) the market rate for the service." ER 441, ¶ VI.C.3. And while the order prohibits the servicer from earning a profit on default-servicing fees (ER 441, ¶ VI.C.5), it does **not** prohibit an affiliated vendor from earning a profit.

Thus, both California law and the CFPB consent order the Giottas reference explicitly permit servicers to use affiliated, for-profit vendors for default services. There is thus no basis for creating a special duty to disclose the vendor's cost and profit structure when the law otherwise overwhelmingly rejects any duty to disclose the costs and profits that make up contractually authorized charges.

\* \* \* \*

Ocwen separately itemized the type and amount of each charge it imposed on the Giottas and provided accurate information about those charges. The Giottas cannot dispute that those charges were contractually authorized and permitted by law or that all of the information Ocwen provided was correct. Instead, the Giottas are forced to claim that Ocwen violated a disclosure duty that has no basis in the governing contract or in any statute, regulation, court decision, or other authority. The district court correctly rejected that disclosure duty as baseless, and this Court should affirm the court's dismissal order for this reason alone.

## II. THE GIOTTAS' CLAIMS ARE BARRED BY THEIR FAILURE TO COMPLY WITH THE CONTRACTUAL NOTICE PROVISION.

This Court can affirm the district court's dismissal solely for the reasons stated in Section I, above. But this Court can also affirm for a separate and independent reason: the Giottas undisputedly did not provide Ocwen with notice of their claim and an opportunity to take corrective action as required by their deed of trust. The district court correctly held that the notice provision applied to the claims in this case, and this Court could affirm for this reason as well.

The notice provision states:

> Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.

ER 269, § 20. The Giottas do not dispute that the notice provision is enforceable or that they provided no such notice, but they claim they were free to disregard the provision for two reasons: (1) the provision cannot apply to claims under statutes like the FDCPA; and, (2) the provision does not require notice to loan servicers like Ocwen. Both arguments fail.

**A.** **The notice provision applies to the claims here because the claims arise from Ocwen's performance of contractual duties.**

The notice provision applies to "***any*** judicial action … that arises from the other party's actions pursuant to this Security Instrument …." ER 269, § 20 (emphasis added). This is not limited to breach-of-contract claims, as the provision makes clear by including contract claims as a separate category of claims to which the provision applies. ER 268, § 20 (noting that provision applies to a claim "that arises from the other party's actions pursuant to this Security Instrument *or* that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument ….") (emphasis added).

Here, the Giottas complain about the manner in which Ocwen assessed property-inspection and valuation fees. Ocwen imposed these fees based on explicit authorization in the deed of trust. ER 268, § 14; ER 266, § 9. Thus, the claims here arise from Ocwen's "actions pursuant to" the deed of trust and fall squarely within the language of the notice provision.

**1.** **Courts look at the relevant conduct, not a plaintiff's choice of legal theory, in deciding if contractual limitations apply.**

Consistent with the plain language of the notice provision, courts routinely apply contractual limits on litigation like the notice provision here (*e.g.*, choice-of-law; choice-of-venue; jury-waiver) to statutory or other claims that are not contract claims so long as the claim relates to the contract. "A claim 'relates to' a contract

when 'the dispute occurs as a fairly direct result of the performance of contractual duties.'" *Bahamas Sales Associate, LLC v. Byers*, 701 F.3d 1335, 1340–41 (11th Cir. 2012) (assessing forum-selection clause).

Applying this standard, courts have applied notice and other contractual provisions to FDCPA and other federal or state statutory claims that arose from the performance of contractual duties. In *Sotomayor v. Deutsche Bank Nat'l. Trust Co.*, a defaulted borrower sued his lender and loan servicer under the FDCPA, the federal Truth in Lending Act, and the Florida Consumer Collection Practices Act, alleging defendants improperly attempted to collect property-inspection fees that were inflated by servicer profit. 2016 WL 3163074, at * 1 (S.D. Fla. Feb. 5, 2016) *as clarified by Sotomayor v. Deutsche Bank Nat'l Trust Co.*, 2016 WL 3163075, at *2 (Mar. 18, 2016) (order of dismissal was without prejudice). The court dismissed the case because plaintiffs failed to satisfy the notice provision, and held the provision applied to the statutory claims because the claims were based on fees imposed under the contract:

> Plaintiffs' alleged TILA violation—as well as all of Plaintiffs' claims—are based on their contention that the timely provided payoff statement was inaccurate because of allegedly wrongfully inflated property inspection fees charged to the mortgage loan account, where the terms of the mortgage loan contract provide the basis for the servicer conducting property inspections on properties whose loans are in default and charging the mortgage loan account fees for those property inspections. … Here, unlike in *St. Breux*, the decision of whether the notice and cure provision applies in this case is not a close one. It clearly applies.

*Sotomayor*, 2016 WL 3163074, at * 2. *See also*, *Hill v. Nationstar Mortgage*, 2015 WL 4478061, at * 3 (S.D. Fla. Jul. 6, 2015) (relying on failure to comply with notice provision to dismiss federal and state statutory claims based on property-inspection fees that were allegedly too frequent and inflated by profit for servicer and affiliated vendor; "regardless of the cause of actions alleged, the Homeowners' claims are entirely based on their mortgage contracts …."); *Sandoval v. Wolfe*, 2017 WL 244111, at * 3 (S.D. Fla. Jan. 19, 2017) (dismissing under notice provision FDCPA, FCCPA, and Real Estate Settlement Procedure Act claims based on allegedly improper default-servicing fees; "the terms and duties under the mortgage and note are what provide the basis for [the servicer] to charge to and recover these fees from Plaintiff.").

The Giottas here make virtually the same allegations as in *Sotomayor*, *Hill*, and *Sandoval*, *i.e.*, that their mortgage statements are inaccurate because of misstatements about default-servicing fees. The Giottas' allegations, just like those in *Sotomayor*, *Hill*, and *Sandoval* are based on fees that were imposed because they are explicitly authorized by the contract. *Id.* Thus, the dispute in this case is "a fairly direct result of the performance of contractual duties" and is subject to the notice provision. *Bahamas Sales*, 701 F.3d at 1340–41.

Other courts have followed the same approach as *Sotomayor*, *Hill*, and *Sandoval* in finding that similar contractual provisions apply to statutory claims

based on contractually authorized conduct. *See Levinson v. Green Tree Servicing*, 2015 WL 1912276, at *2 (M.D. Fla. Apr. 27, 2015) (applying jury-waiver provision to defaulted borrower's FDCPA and FCCPA claims based on loan servicer's collection activity because "Defendant's alleged behavior in violation of the FDCPA and FCCPA was due to Plaintiffs' failure to pay as contractually obligated under the same mortgage."); *Niyaz v. Bank of Am.*, 2011 WL 63655, at *2 (E.D. Va. Jan. 3, 2011), *aff'd,* 442 F. App'x 838 (4th Cir. 2011) (dismissing claims, including violations of federal National Housing Act, for failure to comply with notice provision because "all of Plaintiff's allegations arise from actions taken pursuant to the Deed of Trust."); *Johnson v. Countrywide Home Loans, Inc.*, 2010 WL 5138392, at * 2 (E.D. Va. Dec. 10, 2010) (dismissing FDCPA, TILA, Real Estate Settlement Procedures Act, and Fair Credit Reporting Act claims based on, among other things, charging fees that allegedly violated statutory limits).

California federal courts have taken a similar approach in applying contractual choice-of-law provisions to state statutory claims based on actions taken under a loan contract. *Cirino v. Bank of Am., N.A.*, 2014 WL 9894432, at * 11 (C.D. Cal. Oct. 1, 2014) (applying contractual choice-of-law provision to UCL[5] claim based on alleged misrepresentations regarding property-inspection fees; "Plaintiff's claims arise out of his Deed of Trust, and are thus subject to the

---

[5] *Cirino* included a statutory claim, so the Giottas are wrong to say that the claims in that case were "expressly contractual." Br., p. 44.

Deed of Trust's choice-of-law provision."); *Gustafson v. BAC Home Loans Servicing*, 294 F.R.D. 529, 536 (C.D. Cal. 2013) (applying choice-of-law provision to UCL claim based on lender-placed insurance; "The crux of Plaintiffs' claim is that Defendants engaged in unfair business practices when they used their authority under a borrower's *mortgage contract* to force place insurance that included costs and fees unrelated to the provision of insurance.") (emphasis in original).

The Giottas argue that their choice to assert statutory rather than contract claims renders the notice provision inapplicable. Br., p. 49 (noting that they don't sue under the Deed of Trust but "instead rely on the FDCPA, Rosenthal Act and UCL."). But there are two problems with this. First, the conduct at issue, rather than the Giottas' unilateral choice of legal theory, dictates whether the notice provision applies. The provision itself makes this clear: it applies to "***any*** judicial action … that arises from the other party's ***actions*** pursuant to this Security Instrument …." ER 269, § 20 (emphasis added). Thus, the defendant's ***actions*** dictate whether the provision applies. The legal theory doesn't matter because the provision applies to ***any*** judicial action, whether sounding in contract, tort, or statutory violation. Circuit court guidance confirms the need to focus on the relevant conduct rather than legal theory. *See Bahamas Sales*, 701 F.3d at 1340–41 ("A claim 'relates to' a contract when 'the dispute occurs as a fairly direct result of the performance of contractual duties.'").

The conduct at issue here—Ocwen's imposition of property-inspection and valuation fees—is explicitly authorized by the contract and thus done under the contract. The Giottas cannot change the nature of that conduct by choosing to forego a breach-of-contract claim.

Further, the Giottas incorrectly state that they "do not rely on the Deed of Trust." Br., p. 49. In reality, although they chose not to include a breach-of-contract claim, their statutory claims are substantially intertwined with the contract. Specifically, the Giottas' FDCPA claim requires showing that Ocwen's billing statements were ***materially*** misleading, (*see infra*, Section I.D.3), and the Giottas claim they meet materiality because, had they been aware of the vendor's profit, they "could have sued under the Deed of Trust's requirement that such fees be 'reasonable or appropriate.'" Br., p. 27. Thus, the Giottas reference a claimed breach of contract in trying to support their FDCPA claim; they cannot now assert that the contract has nothing to do with their claim.

### 2. The Giottas' cited cases are distinguishable because they involve conduct that is not addressed by the contract.

Of course, a borrower's statutory claims against a lender or servicer do not ***always*** relate to the contract. As many of the cases cited by the Giottas show, and unlike the allegations here, claims based on conduct that is not addressed or authorized by the contract are not subject to contractual provisions like the notice provision. *See Graham v. Ocwen Loan Servicing*, 2016 WL 1573177, * 1 (S.D.

34

Fla. Apr. 19, 2016) (servicer allegedly violated RESPA by failing to respond to borrower's written request for information); *Kim v. Shellpoint Partners*, 2016 WL 1241541, * 7 (S.D. Cal. Mar. 30, 2016) (servicer allegedly violated TILA by failing to include information in monthly statements required by statute); *Colon v. Nationstar Mortg.*, 2015 WL 7422598, * 1 (S.D. Fla. Nov. 17, 2015) (servicer allegedly violated federal Telephone Consumer Protection Act by using automatic dialer to repeatedly call Plaintiff's cell phone without consent); *Schwartz v. Comenity Cap. Bank*, 2015 WL 410321, * 11 (S.D.N.Y. Feb. 2, 2015) (lender allegedly violated TILA by not providing billing-dispute disclosures required when credit-card account opened); *Taub v. World Financial Bank*, 950 F. Supp. 2d 698, 703 (S.D.N.Y. 2013) (same); *Sigwart v. U.S. Bank N.A.*, 2014 WL 1322813, * 7 (D. Haw. Mar. 31, 2014) (lender's notice of foreclosure sale allegedly violated state-specific statutory requirements); *St. Breux v. U.S. Bank, N.A.*, 919 F. Supp. 2d 1371, 1373–74 (S.D. Fla. 2013) (lender allegedly violated TILA by failing to respond to written request to identify owner or master servicer of plaintiff's loan); *Beyer v. Countrywide Home Loans*, 2008 WL 1791506, at * 2 (W.D. Wash. Apr. 18, 2008) (claims for unjust enrichment and violation of state Consumer Protection Act for charging fee for payoff statement that was not authorized by or even

mentioned in contract); *Gerber v. First Horizon*, 2006 WL 581082, at * 1 (W.D. Wash. Mar. 8, 2006) (same).[6]

The Giottas cite these cases in support of their position that the notice provision does not apply here. Br., pp. 46–47, n. 6. But all of these cases involve statutory duties that are independent of any contractual provisions, *e.g.,* a prohibition on autodialing cell phones without consent; or, a requirement to provide certain defined disclosures. By contrast, this case involves fees that were explicitly authorized by the contract and that the Giottas claim could have been challenged as violating the contract if Ocwen had disclosed its vendor's costs and profits. The allegations here are thus significantly intertwined with the contract.

### 3. The Giottas raise new arguments on appeal that were waived and that should be rejected in any event.

The Giottas also raise two arguments regarding the notice provision for the first time on appeal: that applying the notice provision to their claims here would "annul or alter FDCPA requirements" and that they should be permitted to

---

[6] A few of the Giottas' cases wrongly conclude, with virtually no analysis, that any statutory claim for "deceptive business practices" under a statute cannot be subject to a notice provision. *See, e.g., Belcher v. Ocwen Loan Servicing*, 2016 WL 7243100, at * 4 (M.D. Fla. Dec. 15, 2016); *Patrick v. Teays Valley Trustee*, 2012 WL 5993163, at * 9 (N.D. W.Va. Nov. 30, 2012). These cases make no attempt to determine if the conduct at issue was authorized by the contract or if the propriety of the conduct requires interpreting the contract, but instead seem to hold that ***no*** statutory claim can ***ever*** relate to the contract. This Court should reject such a simplistic, broad-brush approach in favor of the strong consensus adopted by other courts that look at whether the conduct at issue is addressed by the contract rather than the legal theory plaintiffs choose.

disregard the notice provision because FDCPA violations cannot be cured. Br., pp. 40-44. First, the Giottas never made either argument below, so both arguments have been waived. *Baccei v. United States,* 632 F.3d 1140, 1149 (9th Cir. 2011) ("Absent exceptional circumstances, we generally will not consider arguments raised for the first time on appeal [and] we will not reframe an appeal to review what would be in effect a different case than the one decided by the district court.")

Beyond waiver, the Giottas' new arguments are contrary to the numerous cases finding that notice provisions or other contractual limitations apply to FDCPA or other federal[7] or state[8] statutory claims. *Sotomayor*, 2016 WL 3163074, at * 2 (applying notice provision to FDCPA and TILA claims); *Sandoval*, 2017 WL 244111, at * 3 (applying notice provision to FDCPA, FCCPA, and RESPA

---

[7] The Giottas rely on a provision of the FDCPA stating that it prevails over inconsistent state law. Br., p. 40, *citing* 15 U.S.C. § 1692n. But the cases described above apply the notice provision to claims asserted under numerous other federal statutes with similar provisions. *See* 15 U.S.C. § 1610(a)(1) (TILA); 12 U.S.C. § 2616 (RESPA); 15 U.S.C. § 1681t (FCRA); 12 U.S.C. § 1701j-3 (National Housing Act).

[8] The Giottas rely on a provision of the Rosenthal FDCPA stating that individuals cannot waive the protections of the statute. Br., p. 43, n.4, *citing* Cal.Civ.Code § 1788.33. But again, the cases described above apply the notice provision to claims arising under the UCL and the Florida Consumer Collection Practices Act, which also cannot be waived. *Bickel v. City of Piedmont*, 16 Cal. 4th 1040, 1048 (1997) ("a law established for a public reason cannot be waived or circumvented by a private act or agreement") (internal citation and quotation omitted), *superseded by statute on other grounds as noted in DeBerard Properties, Ltd. v. Lim*, 20 Cal. 4th 659, 668 (1999); *Belcher v. Ocwen Loan Servicing, LLC,* 2016 WL 7243100, at *1 (M.D. Fla. Dec. 15, 2016) ("Neither the federal act nor the Florida act permits a consensual waiver of the alleged claims.").

claims); *Hill*, 2015 WL 4478061, at * 3 (applying notice provision to federal and state RICO claims); *Levinson*, 2015 WL 1912276, at * 2 (applying jury-waiver provision to FDCPA and FCCPA claims); *Niyaz*, 2011 WL 63655, at *2 (applying notice provision to National Housing Act claim); *Johnson*, 2010 WL 5138392, at * 2 (E.D. Va. Dec. 10, 2010) (applying notice provision to FDCPA, TILA, RESPA, and FCRA claims); *Cirino,* 2014 WL 9894432, at * 11 (applying choice-of-law provision to UCL claim); *Gustafson*, 294 F.R.D. at 536 (same).

Further, application of the notice provision to FDCPA claims wouldn't "alter or annul" the statute; it would simply add a very easy-to-satisfy condition on an individual filing an FDCPA case. Defendants would not be free to violate the FDCPA as they would still be subject to enforcement actions (15 U.S.C. § 1692*l*) and individual actions once the condition is met. All of the Giottas' cases (Br., p. 41) involve situations where defendants argued that the FDCPA's requirements no longer applied to them (*i.e.*, that they could ***never*** be sued) by virtue of some claimed conflict with state law.[9] None of the Giottas' cases hold that a notice

---

[9] *Piper v. Portnoff Law Assocs., Ltd.*, 396 F.3d 227, 234 (3d Cir. 2005) (rejecting argument that FDCPA disclosure requirements were not applicable to debt-collection letter sent under state law); *Romea v. Heiberger*, 163 F.3d 111, 116 (2d Cir. 1998) (same); *Goodrow v. Friedman & MacFadyen, P.A.*, 788 F. Supp. 2d 464, 471 (E.D. Va. 2011) (same); *Hochberg v. Lenox, Socey, et. al*, 2017 WL 1102637, at *4 (D. N.J. Mar. 24, 2017) (defendant not excused from suing and making false allegations against plaintiff in underlying collection action simply because defendant was trying to comply with state-court necessary-party rules); *Derr v. Kimball, Tirey & St. John LLP*, 2012 WL 12874923, at *2-3 (S.D. Cal.

provision or other contractual limitation cannot be applied to FDCPA claims, which numerous courts have held is permissible.

Finally, even if an FDCPA violation cannot be fully "cured", there is still a strong purpose to enforcing the notice provision here: doing so allows the parties to potentially avoid or at least minimize litigation. Had the Giottas complied with the notice provision, Ocwen could have explained that the fees at issue are contractually authorized and are appropriate in amount, or waived the fees entirely, which may have dissuaded the Giottas from suing over the fees. Ocwen's waiver of fees could have prevented an eventual foreclosure, which also could have reduced the likelihood of litigation.[10] And even if the Giottas still sued, Ocwen's waiver of fees (and the potential prevention of a foreclosure) would have at least eliminated any claimed actual damages from an FDCPA case, thereby limiting the issue to one of statutory damages. Significantly, the contract provision itself only requires the opportunity to "take corrective action" (ER 269, § 20), not to create a complete legal defense to any possible claims. But the Giottas' failure to comply with the notice provision denied Ocwen the contractually agreed opportunity to take any such corrective action, which could have avoided or limited this litigation.

Aug. 14, 2012) (rejecting argument that FDCPA did not apply to false statements made by debt-collection attorneys because of litigation privilege).

[10] Indeed, a prior version of the Giottas' complaint here stated that the fees at issue can cause a "cascade" that "can drive borrowers further into default, and further towards foreclosure …." SER 55, ¶ 68.

Thus, the Giottas' new arguments were waived and lack merit in any event.

## B.     The notice provision applies to claims against Ocwen.

The Giottas also seek to avoid compliance with the contractual notice provision by arguing they were not required to give notice to a loan servicer like Ocwen. But the Giottas are wrong for at least three reasons.

### 1.     The deed of trust says that its provisions benefit servicers.

The Giottas argue that the notice provision's reference to the "Lender" means that a loan servicer like Ocwen is not entitled to notice before being sued. But they ignore a separate provision of the deed of trust that makes clear that the deed of trust is intended to benefit not just the lender but also the lender's assigns:

> The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

ER 268, § 13.

### a.     Ocwen is an assign.

Under Section 13, Ocwen is entitled to the benefits of the deed of trust because the lender assigned Ocwen the loan's servicing rights. Br., p. 23, n. 2 (noting Ocwen "acquired the servicing rights to Plaintiffs' mortgage …"); ER 103, ¶ 16 ("the servicing rights to Plaintiffs' mortgage loan were transferred to Ocwen …"). These servicing rights included the right to collect and apply payments, assess and collect fees for default services, manage the escrow account for payment of taxes and insurance, and pursue collections or foreclosure for defaulted

loans. ER 114, ¶ 31; ER 279 ("the right to collect payments from you, is transferring … to your new servicer, Ocwen …").

These servicing rights are discrete property rights that are bought and sold, as reflected by a Mortgage Servicing Rights Purchase and Sale Agreement that the Giottas attached to their complaint. *See generally* ER 185–259. Specifically, the Purchase and Sale Agreement states that the Agreement "will sell, transfer ***and assign***, to Purchaser, all of Seller's right, title and interest in and to such Mortgage Servicing Rights …." ER 192 (emphasis added). The Agreement defines the extensive powers that are associated with assignment of the servicing rights. ER 200 (defining Mortgage Servicing Rights). And the Agreement characterizes the servicing rights as being among the "Purchased Assets" governed by the Agreement. ER 207.

The sale of mortgage servicing rights to Ocwen constitutes an assignment of those rights and renders Ocwen an assign. The Ninth Circuit and California law recognize that the parties' intent controls whether there is an assignment; no magic words are needed. *California Ins. Guarantee Assn. v. Workers' Comp. Appeals Bd.*, 203 Cal. App. 4th 1328, 1335 (2012) ("[i]n determining whether an assignment has been made, the intention of the parties as manifested in the instrument is controlling."); *U.S. ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 748 (9th Cir. 1993) ("It is well established that terms of art are not required for a valid assignment. …

Instead, the parties' intent controls."). Here, Ocwen was assigned mortgage servicing rights and is thus properly considered an assign of the lender. *Wolhuter v. Carrington Mortg. Servs., LLC*, 2015 WL 12819153, at *7 (M.D. Fla. Oct. 28, 2015) (finding servicer was assign of lender under Section 13 and thus entitled to enforce jury waiver), *reconsideration denied*, 2016 WL 7177620 (M.D. Fla. July 22, 2016). As a result, under Section 13 of the deed of trust, Ocwen is entitled to the benefit of all covenants and agreements of the deed of trust, including the notice provision.

> **b.** **Section 13's reference to Section 20 is irrelevant to the notice provision.**

Ocwen relied on Section 13 in moving to dismiss a prior version of the Giottas' Complaint. SER 11–12. But the district court incorrectly believed that the notice provision in Section 20 could not apply to the lender's assigns because Section 13 contains a limited exception relating to Section 20. ER 580–81 *citing* ER 268, § 13 ("The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.").

But the district court misread Section 13. The exception in Section 13 only applies to provisions that ***bind*** the lender, not to provisions that ***benefit*** the lender. This is clear because the parenthetical containing the exception only follows the word "bind" and not the word "benefit". ER 268, § 13. Further, since the district

court ruled, at least one court has clarified the interplay of Section 13 and Section 20. In *Allen v. JPMorgan Chase*, 2016 WL 1029334 (S.D. Miss. Mar. 14, 2016), the court applied the notice provision to a claim against the lender's assign and rejected the plaintiff's argument (which the district court here mistakenly accepted) that the exception in Section 13 precludes applying the notice provision to the lender's assigns:

> Plaintiffs argue that the reference to Section 20 explicitly denies Defendant the benefit of the notice and cure provision. Plaintiff, however, misreads both sections.
>
> First, the exception provided by Section 13 relieves any assignees of [the lender] from being bound by any obligation found in Section 20, but does not deprive an assignee of any benefit under Section 20. Receiving notice prior to the initiation of a lawsuit and being afforded time to cure would be a benefit to Defendant under Section 20, not an obligation.
>
> \* \* \* \*
>
> Second, the exception, from a plain reading of both sections, appears only to ensure that the assignor, and not the assignee, remains bound by Section 20 to notify the Borrower of the assignment. As an assignee of [the lender], then, Defendant receives the benefit of every covenant and agreement of the Deed of Trust, including the notice and cure provision under Section 20.

*Allen v. JPMorgan Chase*, 2016 WL 1029334, at \* 2.

Thus, as the assignee of the loan's mortgage servicing rights, Ocwen is the lender's assign and is entitled to the benefit of the deed of trust's provisions, including the notice provision.

## 2. The parties understood that "Lender" referred to the servicer.

There is a separate and independent reason—beyond Section 13—to apply the notice provision to claims against Ocwen: the parties' subsequent contractual modification shows that they understood the term "Lender" included the servicer. Specifically, the Giottas entered into a loan modification in 2011 that defined "Lender" to include both the noteholder and the servicer. The district court relied on that modification to find that Ocwen was entitled to rely on the notice provision, and this Court could affirm for this additional reason.

### a. The loan modification defines "Lender" to include both the noteholder and the loan servicer.

The Giottas executed the deed of trust in 2007 (ER 272) and executed an agreement modifying the deed of trust in 2011. ER 86–91. The loan modification agreement recognized that the noteholder and the loan servicer were different entities, but defined the term "Lender" to include both entities. ER 86 ("Borrower acknowledges that 'Lender' is the legal holder and the owner, or agent/servicer for the legal holder and owner, of the Note and Security Instrument …."). The loan modification also states that to the extent the modification conflicts with the deed of trust, the modification controls. ER 88 ("In the event of any inconsistency between this Agreement and the terms of the Note and Security Instrument, this Agreement shall govern.").

Thus, given the definition of "Lender" in the loan modification agreement, the term Lender in Section 20 of the deed of trust includes Ocwen as the loan servicer. The notice provision therefore required the Giottas to provide notice to Ocwen before the Giottas "commence[d] … any judicial action … that arises from [Ocwen]'s actions pursuant to this Security Instrument …."

### b. Nothing about the deed of trust precludes applying the loan modification's definition of "Lender."

The Giottas argue that the loan modification's definition of "Lender" to include both the noteholder and the servicer is inconsistent with the deed of trust's separate reference to "Loan Servicer." There is no such inconsistency (although the loan modification would control if there was). Both the deed of trust and loan modification recognize that the noteholder and the loan servicer are different entities. The deed of trust does this to explain that the noteholder and loan servicer may change independently of one another and that the borrower will always receive notice of any change in servicer. ER 269, § 20. The loan modification then simply states that the term "Lender" will reference both the noteholder and the loan servicer. Of course, there's nothing unusual about defining one term to refer to multiple separate entities; the deed of trust defines "Borrower" as both Victor and Loralee Giotta. ER 261. Thus, there is nothing inconsistent about the recognizing that the noteholder and loan servicer are different entities while using a single term to refer to them both.

The Giottas say that the loan modification's definition of "Lender" doesn't apply to the deed of trust because the loan modification "deal[s] exclusively with extended loan repayment." Br., p. 54. But the loan modification is not so limited; it also deals with late fees (ER 87, ¶ 6), the ongoing validity and priority of the deed of trust (ER, ¶ 7), the servicer's ability to enforce the due-on-sale provision in the deed of trust (*Id.*, ¶ 8), and the servicer's ability to exercise all the deed of trust's remedies (including imposing the fees at issue here) in the event of a default. *Id.*, ¶ 9. Thus, the loan modification is much broader than the Giottas claim.

The Giottas also claim that the "context" of the notice provision rebuts the admitted presumption that the same term should have the same meaning throughout a contract. Br., p. 53. But the only "context" they can provide to override the plain language of the loan modification's definition of Lender is the fact that the notice provision uses the word "party." *Id.* The Giottas claim that word cannot include the servicer because the servicer is not a party to the deed of trust. *Id.* But this is flawed for at least two reasons.

First, the prior servicer became a party to the note and deed of trust by virtue of the loan modification agreement. It signed the modification agreement (ER 91) and agreed it "will be bound by, and comply with, all of the terms and provisions of the deed of trust." ER 88, ¶ 9. In other words, the loan modification agreement considered the servicer to be a party to the deed of trust. Thus, when the parties

executed the loan modification, there is no reason to believe the parties intended to exempt Section 20 from the otherwise applicable definition of the word "Lender".

Further, the notice provision itself makes reference to notice that is given by the servicer, which further undermines the Giottas' argument that the provision necessarily excludes the servicer. The provision provides that no judicial action can be filed "until such Borrower or Lender has notified the other party …." of the issue and provided an opportunity to take corrective action. ER 269, § 20. In other words, the **Borrower** or **Lender** must provide the notice. But the very same section states that an acceleration notice, which is provided by the servicer at the start of foreclosure proceedings, satisfies the notice provision. *Id.* ("The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20."); *see also* ER 114, ¶ 31 (noting that servicer's duties include "pursuing collections or foreclosing on borrowers' homes."). Thus, Section 20 contemplates that a servicer can provide a notice to be given by the "Lender." Given that, the "context" of Section 20 does not justify disregarding the plain language in the loan modification defining "Lender" to include the loan servicer.

### 3. Even without the loan modification, the most reasonable interpretation of the deed of trust is to read "Lender" as including the servicer.

Beyond Section 13, and beyond the definition of "Lender" in the loan modification, a plain reading of the deed of trust shows that the term "Lender" is often used in the deed of trust to include the servicer. Multiple provisions of the deed of trust authorize only the "Lender" to do things that are done by the servicer. *See, e.g.,* ER 263, § 1 (Lender receives payments); § 2 (Lender applies payments); § 3 ("Borrower shall pay Lender the Funds for Escrow Items …"); ER 264, §4 (referring to obligations RESPA imposes on Lender regarding escrow account; RESPA imposes escrow obligations on servicers, *see* 12 U.S.C. § 2605(g); 12 C.F.R. § 1024.34); ER 264–65, § 5 (Lender monitors, purchases, and makes claims on property insurance); ER 270, ¶ 22 (Lender gives notice of acceleration and invokes power of sale); *see also* ER 114, ¶ 31 (describing servicer's roles). Indeed, the deed of trust authorizes only the "Lender" to impose the property-inspection and valuation fees at issue here (ER 268, § 14), and the Giottas acknowledge that servicers like Ocwen are authorized to impose those fees. Br., p. 5 ("Ocwen had the added role of performing and charging the Giottas for certain services to protect the lender's interest in the Giottas' loan.").

In fact, the Giottas' attempt to avoid compliance with the notice provision leads them into a hopeless contradiction. On the one hand, the Giottas

acknowledge that the servicer was authorized to impose fees for property inspections and property valuations (Br., p. 5) even though the deed of trust only authorizes the "Lender" to impose such fees. ER 268,¶ 14. But at the same time, the Giottas try to claim that the reference to the exact same "Lender" in Section 20 of the deed of trust cannot possibly include the servicer. There is no reason to read the word "Lender" in Section 20 differently than it is used through the remainder of the document.

Thus, while the Giottas claim it would be "absurd" to read "Lender" to include the servicer (Br., p. 56), that is exactly how the deed of trust repeatedly uses "Lender." The Giottas cite numerous cases in support of their "absurd-results" argument (Br., p. 56–58), but those cases merely establish that the noteholder and servicer are different entities. Br., pp. 56–58. That is undisputed but is not dispositive of whether the deed of trust uses the word "Lender" to include both the noteholder and the loan servicer. And the numerous instances discussed above in which the deed of trust authorizes the "Lender" to perform the servicer's tasks strongly demonstrates that the servicer is included in the word Lender.

The Giottas also claim that interpreting "Lender" to include the servicer would mean that the servicer is entitled to the proceeds of the underlying debt. Br., p. 58. But a separate servicing agreement governs the relationship of the noteholder and the servicer, including how loan payments received by the servicer

are handled. ER 114, ¶ 32 (describing servicing agreement); ER 205 (defining

servicing agreement as "contracts, and all applicable rules, regulations, procedures,

manuals and guidelines incorporated therein, defining the rights and obligations of

the Investor [*i.e.,* the loan owner] and servicer."). Thus, interpreting the word

"Lender" in the deed of trust to refer to both the noteholder and the servicer would

have no impact on the separate contractual relationship between the noteholder and

servicer.

Finally, contrary to the Giottas' argument, it would generate absurd results

to ***not*** interpret the notice provision as requiring notice to the servicer. As

discussed above in this section, most of the responsibilities the deed of trust gives

to the "Lender" are actually performed by the servicer. Thus, if the borrower

believes those tasks were performed improperly, the servicer will be responsible

and the target of a lawsuit. The notice provision can only be effective if the entity

most likely to be the litigation target (*i.e.*, the servicer) is entitled to receive notice

and an opportunity to take corrective action. Limiting the provision to the

noteholder essentially neutralizes it, which should cast serious doubt on the

plausibility of the Giottas' interpretation.

* * * *

Thus, the notice provision applies to claims against Ocwen for multiple

reasons. Section 13 explicitly extends the benefits of the deed of trust, such as the

notice provision, to the lender's assigns, which Ocwen became when it acquired the loan's servicing rights. Second, the loan modification explicitly defines the word "Lender" to include the servicer. Finally, the deed of trust repeatedly authorizes only the "Lender" to perform tasks that are performed by the servicer, so the notice provision would become meaningless unless its protections were extended to the servicer. Thus, it is not surprising that many cases have applied the notice provision or other similar provisions to claims against servicers. *Charles v. Deutsche Bank Nat'l Trust Co.*, 2016 WL 950968, at *3–4 (S.D. Fla. Mar. 14, 2016) ("The Court also rejects the Plaintiff's contention that SPS, as a non-party to the mortgage, cannot enforce the mortgage's pre-suit notice and cure provision."); *Trevathan v. Select Portfolio Servicing, Inc.*, 142 F. Supp. 3d 1283, 1291 (S.D. Fla. 2015) ("Plaintiff contends that he was not required to provide notice to SPS because SPS is a loan servicer, not the "Lender" as specified in the contract provision. The Court rejects this argument."); *Ferraro v. Wells Fargo N.A.*, 2013 WL 5357109, at *1 (M.D. Fla. Sept. 24, 2013) (applying jury-waiver provision despite uncertainty whether defendant was servicer or owner of loan); *Paschette v. Wells Fargo Bank, N.A.*, 2011 WL 2470314, at *4–5 (M.D. Fla. June 21, 2011) (servicer could assert the jury-waiver).

## CONCLUSION

This case is about fees that were: (1) imposed after the Giottas admittedly defaulted on their loan; (2) explicitly and undisputedly authorized by the contract; and, (3) separately and accurately disclosed by type and amount. The fees at issue here are ***not*** (1) challenged as being for services that were performed too frequently (or not performed at all); (2) challenged as being beyond a market rate or otherwise excessive in amount; or, (3) alleged to include any profit for Ocwen.

Rather than directly challenge the contractual authority for the fees, the amount or frequency of the fees, or the accuracy of Ocwen's monthly statement, the Giottas are forced to claim that Ocwen's accurate disclosure of authorized fees was nonetheless misleading because Ocwen did not break down the costs and profits of its vendor. But the district court got it right: there is no authority (in statutes, in regulations, in cases, or elsewhere) for this unprecedented disclosure duty. To win reversal, the Giottas need this Court to invent a duty to learn and disclose a vendor's cost and profit structure. This Court should decline to do so, and should affirm the district court's dismissal for this reason alone.

This Court should also affirm the district court's dismissal under the notice provision that the Giottas undisputedly failed to follow. This Court should reject the Giottas' argument that they were free to disregard that enforceable contractual provision. By its terms and under substantial case authority, the provision applies

to ***any*** claims (whether contractual or statutory) that are based on conduct undertaken under the contract. And the provision applies to claims against Ocwen, the loan servicer that was admittedly assigned the right to impose and collect fees under the contract. Thus, dismissal can be affirmed independently under the notice provision.

For either of these two reasons, this Court should affirm the district court's decision.


Dated: June 29, 2017                    Respectfully submitted,

                                        _____*/s/ P. Russell Perdew*_____
                                        P. Russell Perdew

                                        Thomas J. Cunningham
                                        James C. Magid

                                        *Attorneys for Defendant and Appellee*
                                        *Ocwen Loan Servicing, LLC*

## STATEMENT OF RELATED CASES (CIRCUIT RULE 28-2.6)

As counsel for Appellee, I certify that Appellee is not aware of any related cases, as defined by Circuit Rule 28-2.6.

Dated:  June 29, 2017                    Respectfully submitted,

                                         ____*/s/ P. Russell Perdew*_____
                                         P. Russell Perdew

                                         Thomas J. Cunningham
                                         James C. Magid

                                         *Attorneys for Defendant and Appellee*
                                         *Ocwen Loan Servicing, LLC*